## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| JOHN SORENSEN, | Civil No. 09-2842 (JRT/JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| DAVID STERLING MCLAUGHLIN, *acting in his individual capacity as a Lieutenant of the Stearns County Sheriff's Department*, | |
| Defendant. | |

---

Robert Bennett, Andrew J. Noel, Jonathan A. Strauss, and Paul C. Dworak, **GASKINS, BENNETT, BIRRELL, SCHUPP, LLP**, 333 South Seventh Street, Suite 2900, Minneapolis, MN 55402, for plaintiff.

Jason M. Hiveley, Amanda Lea Stubson, and Jon K. Iverson, **IVERSON REUVERS, LLC**, 9321 Ensign Avenue South, Bloomington, MN 55438, for defendant.

On March 13, 2009, defendant David Sterling McLaughlin, a lieutenant in the Stearns County Sheriff's Department, shot plaintiff John Sorensen in the back in the course of arresting him. Sorensen filed suit pursuant to 42 U.S.C. §§ 1983 and 1988, alleging that McLaughlin's improper use of deadly force violated Sorensen's rights under the Fourth Amendment. McLaughlin has moved for summary judgment, arguing that he is entitled to qualified immunity. Because a reasonable factfinder could conclude that McLaughlin violated Sorensen's clearly established right to be free of excessive force, the Court denies the motion.

## BACKGROUND

On March 13, 2009, McLaughlin was the Commander of the Central Minnesota Drug and Gang Task Force ("Task Force").  (Aff. of Robert Bennett, Jan. 7, 2011, Ex. 1, Docket No. 18.)  In that capacity, he supervised an operation involving a controlled buy of methamphetamine from Holly Lynn Faulker at a McStop, a combination gas station and McDonald's restaurant, in St. Cloud, Minnesota.  (*Id.*)  Task Force investigators Jason Dahl and Laura Berg picked up a confidential informant ("CI") who had previously disclosed to the Task Force that Faulkner was a drug dealer.  (Aff. of David Sterling McLaughlin, Nov. 22, 2010, Ex. A at 4-6, Docket No. 15.)  The CI arranged to purchase approximately 12.5 grams of methamphetamine from Faulker in the ladies' restroom at the McStop.  (Dep. of Brent Joseph Fair, May 25, 2010, Ex. 2 at 4, Docket No. 16.)

Faulker and Sorensen knew each other socially, and on the day of the incident she asked Sorensen for a ride to St. Cloud.  (Dep. of John A. Sorensen, June 14, 2010, at 14-16, Docket No. 16.)  Faulkner told Sorensen that she was going to St. Cloud to meet a friend who was to lend her money for a new car.  (*Id.* at 16.)  Sorensen agreed to travel with Faulkner in his 1997 Dodge Caravan while Faulkner drove.  (*Id.* at 20-21.)  Sorensen did not know that Faulkner intended to sell drugs until they were approximately two miles from the McStop.  (*Id.* at 20.)

At the McStop, Task Force agents observed Faulkner and Sorensen walk toward the McDonald's restaurant, where Sorensen ordered a bag of food from the counter.  (*Id.* at 50; Bennett Aff., Ex. 2.)  Sorensen exited the restaurant carrying the bag of food,

walked back to his minivan, and appeared to be wasting time, drawing on the dirt and residue on the window of his car.  (Fair Dep. at 54-55.)  When Faulkner and the CI exited the restaurant, McLaughlin gave the signal to arrest Faulkner and Sorensen.  (*Id.* at 55.)

Investigator Brad Fair exited his vehicle, pointed his gun at Sorensen, and announced that he was an officer and that both Sorensen and Faulkner were under arrest. (*Id.* at 57-58.)  Fair ordered the suspects to put their hands up.  (*Id.* at 58-59.)  Sorensen complied immediately, putting his hands up at Fair's first command.  (Sorensen Dep. at 37-38.)  McLaughlin, approaching Sorensen on Fair's right side, ordered Sorensen to get on the ground while Fair continued ordering him to put his hands up.  (Fair Dep. at 62-63.)  He held his weapon in his right, dominant hand, pointing the gun at Sorensen and then down to the "low ready" position to the side.  (McLaughlin Aff., Ex. A at 21; Dep. of David Sterling McLaughlin, May 26, 2010, at 42-43, Docket No. 16.)  McLaughlin testified that Sorensen was observably unarmed.  (McLaughlin Dep. at 42.)   The Minnesota Bureau of Criminal Apprehension ("BCA"), which subsequently investigated the arrest, determined that Sorensen was "[p]assive[ly] resistan[t]."  (Dep. of Eric Jaeche, May 26, 2010, at 30-31, Docket No. 18.)

McLaughlin grabbed Sorensen on the left side, and continued yelling at him to get on the ground.  (Fair Dep. Ex. 2 at 15.)  According to Sorensen, he was going down to the ground per McLaughlin's command when McLaughlin shot him in the back.  (Sorensen Dep. at 33.)  Fair testified that, just before the gunshot, he observed or felt Sorensen "leaning forward or getting shorter."  (Fair Dep. 72-73; Fair Dep. Ex. 2 at 15.)  After

shooting Sorensen, McLaughlin handcuffed him and conducted a thorough search, finding no weapons.  (McLaughlin Dep. at 43.)

According to McLaughlin, the shooting was accidental:

> I hold [Sorensen], still refusing and he wasn't moving, . . . so I had to pull him hard. . . .  I get him so that he comes around, um, now he's to my left and at some point, I don't know if he, um pushes back or-or what he's doing, but he pushes back and he, and he bumps right into me at that point . . . and my right hand comes up um, and I've got my gun in my right hand. My right hand comes up, um, along his back and I push off of him. . . and at that point, um, somehow my gun goes off. . . .  **I thought I was hitting him with the heel of my hand** . . . .

(McLaughlin Aff., Ex. A at 24 (emphasis added).)  At his deposition, McLaughlin further explained that he lost his balance as Sorensen backed into him; as his right gun-holding hand came up Sorensen's back in an attempt to regain his balance, his finger slipped inside the trigger guard.  (McLaughlin Dep. at 34.)  According to McLaughlin, he did not realize that he had shot Sorensen until after he and Fair handcuffed him and noticed the hole in Sorensen's jacket.  (McLaughlin Aff., Ex. A at 27.)

The record contains no evidence, however, that McLaughlin described the shooting as accidental or asserted that Sorensen bumped into him **until four days after the shooting**, after he had conferred with counsel.  (McLaughlin Aff., Ex. A.)  When he called in to report the incident to Sheriff John L. Sanner, McLaughlin did not even initially state that he was the shooter; Sanner did not recall McLaughlin stating that the shooting was accidental.  (Dep. of John L. Sanner, May 25, 2010, at 37-38, Docket No. 18.)  Likewise, McLaughlin did not make any statement to Fair about why or how Sorensen was shot on the day of the incident.  (Fair Dep. at 86.)

As part of its investigation, a BCA forensic scientist examined McLaughlin's gun, a Smith & Wesson Model 99 .40 caliber handgun. (McLaughlin Dep. at 30; Bennett Aff., Ex. 8.) He determined that the safety mechanisms of the gun were functional, the trigger pull pressure necessary to fire the weapon on double action was 9-9.5 pounds, and that in his testing blows to the muzzle, butt, top, bottom, back, and sides of the firearm failed to cause it to discharge. (Bennett Aff., Ex. 8.) McLaughlin agreed that for the gun to discharge, he would have had to have pulled the trigger himself, exerting 9-9.5 pounds of pull pressure. (McLaughlin Dep. at 32-34.) He also agreed that he is trained to keep his forefinger pointed straight while holding the gun if he is not intending to fire it. (*Id.* at 33.)[1]

Sorensen filed suit against McLaughlin in his individual capacity as a lieutenant of the Stearns County Sheriff's Department, arguing that the shooting constituted excessive force in violation of the Fourth Amendment. McLaughlin now moves for summary judgment on the ground of qualified immunity.

## ANALYSIS

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to

---

[1] Smith & Wesson's manual for the gun similarly warns against placing one's finger inside the trigger guard or on the trigger without the intent to shoot. (Bennett Aff., Ex. 9.)

return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.   QUALIFIED IMMUNITY

"Qualified immunity protects a government official from liability in a section 1983 action unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." *Henderson v. Munn*, 439 F.3d 497, 501 (8th Cir. 2006). In considering an assertion of qualified immunity, the Court must address two questions:

> (1) whether, after viewing the facts in the light most favorable to the party asserting the injury, there was a deprivation of a constitutional or statutory right; and, if so, (2) whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted.

*Id.* at 501-02. "Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009). Courts may exercise discretion in determining the sequence in which it addresses the questions. *Pearson v. Callahan*, 555 U.S. 223, ---, 129 S. Ct. 808, 818 (2009). The Court finds it appropriate to first consider whether, viewing the facts in the light most favorable to Sorensen, a reasonable factfinder could determine that McLaughlin's shooting deprived Sorenson of a constitutional right.

**A.      Constitutional Violation**

The Fourth Amendment protects individuals from "unreasonable searches and seizures . . . ." U.S. Const. amend. IV.  Sorensen claims that McLaughlin's use of force in effectuating his arrest was excessive, thus constituting an unreasonable seizure of his person.   In cases of excessive force, "[t]he dispositive question is whether the amount of force the officer used was objectively reasonable."  *Shannon v. Koehler*, 616 F.3d 855, 862 (8th Cir. 2010).   McLaughlin insists, however, that because this shooting was accidental, the Fourth Amendment is not implicated at all.  *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989) ("[T]he Fourth Amendment addresses misuse of power, not the accidental effects of otherwise lawful government conduct." (internal quotation marks and citation omitted)).  McLaughlin urges the Court to assess his conduct under the much less rigorous intent-to-harm standard applicable to substantive due process claims.  *See Neal v. St. Louis Cnty. Bd. of Police Comm'rs*, 217 F.3d 955, 958 (8th Cir. 2000) ("[I]n rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation, . . . liability [for a substantive due process claim] turn[s] on whether force was applied in a good faith effort . . . or maliciously and sadistically for the very purpose of causing harm." (alteration and omission original) (internal quotation marks omitted)).

The Court must reject McLaughlin's theory.   While the Eighth Circuit has not decided whether an accidental shooting implicates the Fourth Amendment, *see McCoy v. City of Monticello*, 342 F.3d 842, 847 n.3 (8th Cir. 2003), the Supreme Court has

explicitly held that "**all** claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (emphasis original); *see also Nance v. Sammis*, 586 F.3d 604, 609-10 (8th Cir. 2009) (affirming applicability of Fourth Amendment to all excessive force claims). In *Graham* – decided **after** *Brower*, the case defendant cites extensively – the Court did not indicate that its holding excluded accidental shootings.

Moreover, *Brower* does not compel a contrary conclusion. In that case, a suspect driving at high speeds to elude pursuing police was killed when he crashed into a police roadblock. 489 U.S. at 594. The plaintiff alleged that the police engaged in an unconstitutional seizure when they "effectively concealed" the roadblock by placing it unilluminated behind a curve and positioning a police car with its headlights on between the suspect's oncoming vehicle and the truck. *Id.* The Ninth Circuit, analogizing the case to one in which a suspect giving chase unexpectedly loses control of his car and crashes, concluded that no seizure occurred. *Id.* at 595.

The Supreme Court, however, reversed. It agreed that the individual in the Ninth Circuit's **hypothetical** circumstance would not have a Fourth Amendment claim:

> [A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement . . . , nor even whenever there is a governmentally caused and governmentally **desired** termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement **through means intentionally applied**. That is the reason there was no seizure in the hypothetical

> situation that concerned the Court of Appeals [of a chase suspect losing control of his car and crashing absent a roadblock]. The pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit; and though he was in fact stopped, he was stopped by a different means – his loss of control of his vehicle and the subsequent crash. If, instead of that, the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure.

*Id.* at 596-97 (emphasis original). In contrast, the police roadblock, the Court reasoned, was a means of stopping the fleeing suspect intentionally applied by government actors and thus a "seizure" **regardless of whether the officers hoped the suspect would be killed**. *Id.* at 598 ("It may well be that respondents here preferred, and indeed earnestly hoped, that [the suspect] would stop on his own, without striking the barrier, but we do not think it practicable to conduct such an inquiry into subjective intent.").

Likewise, whether or not McLaughlin actually intended to shoot Sorensen, McLaughlin's use of his gun was a means intentionally applied to effectuate the arrest. McLaughlin drew his weapon from his security holster, pointed it at Sorensen, and had it pointed at Sorensen when he shot him in the back. These actions are sufficiently intentional to fall within the ambit of a Fourth Amendment seizure. As the Supreme Court explained in *Brower*,

> [i]n determining whether the means that terminates the freedom of movement is the very means that the government intended **we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned**, or by a bullet in the heart that was meant only for the leg. We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.

*Id.* at 598-99 (emphasis added).   The Supreme Court's hypothetical is exactly what happened here, **according to McLaughlin's own version of the story**: he thought he was hitting Sorensen with the heel of his hand but accidentally discharged his gun.   This passage, combined with *Graham*'s subsequent clarification that **all** claims of excessive force in the course of an arrest are to be analyzed under the Fourth Amendment, forecloses McLaughlin's argument that the Fourth Amendment does not apply to this shooting.[2]

While the Fourth Amendment's "objective reasonableness" standard governs Sorensen's claim regardless of whether the shooting was accidental, the Court notes that a reasonable factfinder could conclude that this shooting was **not** an accident, despite McLaughlin's insistence that it was.   Specifically, it is undisputed that McLaughlin physically engaged Sorensen while holding his gun, that he pointed his gun at Sorensen, and that he placed his finger inside the trigger guard.   The gun was functional and required at least nine pounds of trigger pull pressure to fire.   In *Santibanes v. City of Tomball, Tex.*, 654 F. Supp. 2d 593, 604 (S.D. Tex. 2009), the court was presented with similar forensic testing revealing a properly functioning weapon, meaning that "the only logical explanation for [the weapon's] discharge is that [the officer] applied force to its

---

[2] McLaughlin relies heavily on *Dodd v. City of Norwich*, 827 F.2d 1 (2d Cir. 1987), in which he asserts that the Second Circuit concluded that there can be no Fourth Amendment violation as a matter of law where an individual is shot accidentally in the course of a struggle with a police officer initiated by the individual.   Even disregarding the fact that this case was decided before *Graham* and is factually distinct, *Dodd* does not stand for the proposition for which it is cited.   To the contrary, the *Dodd* majority actually remanded the case to the district court to determine whether the officer's conduct – though not negligent – was nonetheless unreasonable under the Fourth Amendment.   *Id.* at 4.   The district court had only analyzed the claim as a due process violation.   *Id.* at 3.

trigger mechanism."   The court found that circumstance alone sufficient to deny summary judgment to the defendants.  *Id.*  The same is true here.  McLaughlin admitted that he must have pulled the trigger to instigate the discharge.

Moreover, there is no evidence that McLaughlin described Sorensen moving back into him, or that he characterized the shooting as accidental, until at least four days after the incident.  McLaughlin gave no contemporaneous indication that the shooting was not purposeful.  *See Lyons v. City of Conway, Ark.*, No. 4:04CV002303, 2008 WL 2465030, at *9 (E.D. Ark. June 16, 2008) ("Perhaps the strongest evidence that this shooting was accidental is Hobbs's testimony that, as soon as the shot was fired, Defendant asked Hobbs why he, Hobbs, had shot the Plaintiff.  Hobbs had to point out to Defendant that it was **his** still smoking. 45 that had fired the shot, not Hobbs's safely holstered weapon.  Similarly, Defendant's immediate apology to Plaintiff for having shot him . . . strongly weighs against Defendant having any intention of shooting Plaintiff." (emphasis original)).  Fair testified that Sorensen was "leaning forward or getting shorter" when he was shot, undermining McLaughlin's characterization of  Sorensen as disobeying his command and backing up into him.  McLaughlin highlights the fact that the firearm was pointed **up** rather than **at** Sorensen during the physical encounter, but as *Brower* makes clear, the Court must focus on whether the harm resulted from a means intentionally applied, not whether the specific result was intended.

Viewing the facts in the light most favorable to Sorensen, there is a material factual dispute about whether the shooting was volitional.  By contrast, many of the "accidental shooting" cases cited by McLaughlin involved uncontroverted objective

evidence of an actual accident. *See, e.g.*, *Luna v. Ridge*, 436 F. Supp. 2d 1163, 1166 (S.D. Cal. 2006) (gun was caked with sand to the extent that the slide would not come back, investigators concluded that an outside force interfered with normal functioning of the gun, and officer stated, "oh, shit" when he saw suspect was wounded); *Clark v. Buchko*, 936 F. Supp. 212, 218, 220 (D.N.J. 1996) (parties agreed that officer's gun discharged accidentally); *Matthews v. City of Atlanta*, 699 F. Supp. 1552, 1556 (N.D. Ga. 1988) (no evidence that officer shot suspect volitionally; noting difference between the case at bar in one in which an "officer intended the act that ended his subject's freedom of movement" regardless of officer's subjective intent).

Having determined that the appropriate analysis is the Fourth Amendment's standard of "objective reasonableness," the Court must assess whether a reasonable factfinder could conclude that McLaughlin's use of force was objectively reasonable. Courts assess the reasonableness of a particular use of force based on the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. McLaughlin argues that drawing his weapon and keeping it drawn were reasonable actions in light of the fact that Sorensen was travelling with a drug dealer. Sorensen's claim, however, focuses on McLaughlin's discharge of his gun, not the fact that he had it drawn. Generally, in cases "where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

The same evidence that supports a finding that McLaughlin's shot was intentional likewise prevents a finding that McLaughlin's actions were objectively reasonable as a matter of law.   "Where a shooting occurs, an inquiry into reasonableness requires scrutiny of the conduct leading up to the shooting."   *Johnson v. City of Milwaukee*, 41 F. Supp. 2d 917, 929 (E.D. Wis. 1999).   McLaughlin agreed that he is trained to keep his index finger pointed straight while holding the gun if not intending to fire it, yet his finger ended up inside the trigger guard where it exerted at least nine pounds of pull. Sorensen has proffered expert testimony that, contrary to his training, McLaughlin was not holding his firearm in the low ready position as he approached Sorensen.   According to both Fair and Sorensen, Sorensen was bending down to the ground, following McLaughlin's command, when he was shot.   His hands were already up in the surrender position, clutching a bag of McDonald's food.   The officers who testified in this case, including McLaughlin, agreed that the circumstances of Sorensen's arrest did not warrant the use of deadly force.

The Court cannot find as a matter of law that no constitutional violation occurred in these circumstances.   To conclude otherwise would allow officers to escape liability simply by claiming that unreasonable conduct was accidental.   *Id.* ("The word 'accident' is not a talisman for releasing an officer from liability.").

## B.    Clearly Established Right

The second inquiry in the Court's qualified immunity analysis is whether Sorensen's Fourth Amendment rights were clearly established at the time he was shot.

> For a constitutional right to be clearly established, its contours must be
> sufficiently clear that a reasonable official would understand that what he is
> doing violates that right.  This is not to say that an official action is
> protected by qualified immunity unless the very action in question has
> previously been held unlawful; but it is to say that in the light of pre-
> existing law the unlawfulness must be apparent.

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks and citations
omitted).

The right to be free from the use of deadly force, absent an immediate threat to the
officer and others, has been clearly established since at least 1985.  *See Garner*, 471 U.S.
at 11.  Indeed, in his deposition McLaughlin acknowledged the constitutional restraints
on his ability to use deadly force and agreed that the circumstances of Sorensen's arrest
did not warrant its use.  (McLaughlin Dep. at 14-18.)

Since a reasonable factfinder could answer in the affirmative either prong of the
qualified immunity inquiry, *see Nelson*, 583 F.3d at 528, the Court denies McLaughlin's
motion for summary judgment.

This case will be placed on the Court's next available trial calendar

**ORDER**

Based on the foregoing, and the records, files, and proceedings herein, **IT IS
HEREBY ORDERED** that McLaughlin's Motion for Summary Judgment [Docket
No. 12] is **DENIED**.

DATED:  May 23, 2011                           ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                               United States District Judge